**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| ACUITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER GRANTING AND DENYING** |
| vs. | ) | **MOTIONS FOR SUMMARY** |
| | ) | **JUDGMENT AND FOR** |
| North Central Video, LLLP, d/b/a | ) | **DECLARATORY JUDGMENT** |
| Blockbuster Video, Dominic James | ) | |
| Simnioniw, Lyle Edward Hilderman, and | ) | |
| Heather Thomas, | ) | |
| | ) | Case No. 1:05-cv-010 |
| Defendants. | ) | |

This is a declaratory judgment action brought by plaintiff Acuity, an insurance company, seeking a determination of certain coverage issues relating to defendants North Central Video, LLLP, d/b/a Blockbuster Video, Dominic James Simnioniw, and Lyle Edward Hilderman, relative to claims that were being prosecuted against them in state court by defendant Heather Thomas. Senior Judge Conmy has directed the entry of a default judgment as to defendant Simnioniw. The remaining parties have consented to the undersigned's handling of the case for all purposes.

I.    **BACKGROUND**

A.    **Acts giving rise to the claims of liability**

North Central Video, LLLP (NCV) is a limited liability limited partnership formed and registered under North Dakota law. NCV owns and operates the Blockbuster Video franchise on south Washington Street in Bismarck. The record is silent as to who the actual partners of NCV are, but none of the parties contend that Simnioniw and Hilderman were partners, or that they otherwise had an ownership interest in NCV.

1

Heather Thomas, a defendant in this action and plaintiff in the underlying state tort action, was employed by NCV as a customer service manager in the video store.   On December 18, 2003, shortly after 6:00 p.m., Thomas received a telephone call while on duty from a male caller purporting to be a Bismarck police officer.   The person impersonating the officer stated he was investigating an allegation of theft by Thomas, purportedly occurring earlier that afternoon.   The "officer" advised Thomas that she must be searched and that the search could take place either at the police department or, because Blockbuster had a privacy policy, at the store by her manager.

The store manager at the time was defendant Dominic Simnioniw.   He was called in after Thomas "elected" to have the search conducted at the store.   Upon his arrival, Simnioniw proceeded to conduct "a personally invasive and devastatingly humiliating" strip search of Thomas in the words of the amended complaint filed in the state action.   At some point, defendant Lyle Hilderman, another NCV employee, also participated in the search.

Further details regarding what occurred will not be repeated out of respect for the victim. Suffice it to say, that both Simnioniw and Hilderman pled guilty to the offense of disorderly conduct in Bismarck Municipal Court on May 24, 2004.[1]   And, even more significantly for purposes of this case, the jury in the underlying state tort action concluded that both Simnioniw and Hilderman

---

[1] The charging document to which both pled guilty alleged a violation of Bismarck City Ordinance 6-05-01(7) and read in pertinent part as follows:

> That at the time and place defendant did willfully and unlawfully
>> harassed, annoyed, or alarmed another person or in reckless disregard of the fact that another person is harassed, annoyed, or alarmed by his behavior, that person creates a hazardous, physically offensive or serious alarming condition by any act which serves no legitimate purpose, to wit:  Participated in a plan to cause a female to believe she was a suspect in a theft and then permitted her to disrobe and . . . .  in the presence of the two defendants at Blockbuster Video at 207 South Washington Street.
>
> contrary to the City Ordinances of the City of Bismarck . . . .

committed the intentional tort of false imprisonment in concert with the caller posing as the police officer.

### B.    State-court action

In December 2004, Thomas filed a civil action against NCV, Simnioniw, and Hilderman in state court alleging the commission of a generic claim of "intentional tort" and the tort of outrage. In February 2005, Thomas entered into a "settlement agreement" with Simnioniw pursuant to which he agreed to pay $25,000 upon entry of the final judgement in the state action, which amount would be reduced dollar-for-dollar by any judgment amount recovered from the other defendants. In addition, Simnioniw agreed to cooperate in terms of submitting to an interview and appearing as a witness at trial. All of this was in exchange for a release from liability from all claims.

At some point Thomas moved to amend her complaint to include a claim against NCV for negligent hiring and training. While the record is somewhat unclear, it appears the proposed amended complaint also included a claim against NCV for "ratification" of the acts of Simnioniw and Hilderman and an exemplary damage allegation. On May 25, 2006, the state district court granted the motion to amend as to the negligence claim, but denied the motion as to the exemplary damage allegation and also, apparently, to the ratification allegations.

Later, Thomas moved again to amend her complaint to add a claim of false imprisonment. On October 9, 2006, the state court granted the motion as to Simnioniw and Hilderman, but, apparently, not as to NCV, although the record appears to be somewhat muddled as to this point.

On December 12, 2006, the state court granted NCV's motion for summary judgment dismissing the negligence claim against NCV, apparently on the basis of insufficient evidence. While the state-court record is not entirely clear, it appears the net result of the series of rulings by

the district court was that the only theory of liability that it would consider as to NCV was the negligence claim.  Consequently, with the dismissal of this claim upon summary judgment, NCV was effectively dismissed from the case.

In December 2006, Thomas stipulated to the dismissal of her claims of outrage and "intentional tort."  Also, in late December 2006, Thomas and Simnioniw entered into a new settlement agreement.  In addition to purporting to cancel their old agreement, the new agreement provided that the state-court trial would continue as to Simnioniw and that there would be no limit on his liability.  Thomas agreed, however, that she would not levy on any judgment against Simnioniw, except to the extent of any insurance proceeds that may be available under Acuity's policy.  She also agreed she would execute a full and complete satisfaction of any judgment against Simnioniw upon exhaustion of her attempts to obtain coverage from Acuity.

The result of these somewhat convoluted state-court proceedings was that the only claim which remained for trial was the claim of false imprisonment with the only defendants being Simnioniw and Hilderman.  The case was tried on January 9-10, 2007, and the jury returned a verdict in favor of Thomas and against Simnioniw and Hilderman, jointly and severally, in the amount of $250,000 on the false imprisonment claim.  The jury assigned fault as follows: Thomas - 0%; Simnioniw - 35%; Hilderman - 60%, and the unknown caller 5%.  In response to two special interrogatories, the jury also found that Simnioniw and Hilderman were acting in concert with each other and with the unknown caller, which gives rise under North Dakota law to the joint and several liability.  See, e.g., Schneider v. Schaaf, 1999 ND 235, ¶ 22, 603 N.W.2d 869.

On January 29, 2007, following the conclusion of the state-court trial, and midway through the briefing on the motions for summary judgment in this case, Simnioniw executed an assignment of his rights under Acuity's policy to Thomas.

During a conference with the court on May 3, 2007, the parties indicated that Thomas has now filed an appeal to the North Dakota Supreme Court contesting the dismissal of NCV, and that, at least for now, Acuity is still defending NCV in terms of the appeal.

### C.     Federal declaratory proceeding

Within a month of Thomas filing the state-court civil action, Acuity filed this action in January 2005 naming as defendants initially:  NCV, Simnioniw, and Hilderman.  Soon after filing the initial complaint, Acuity filed an amended complaint correcting the name of one of the defendants and then filed a second amended complaint that added Thomas, the plaintiff in the underlying state action, as an additional defendant. In the second amended complaint, Acuity seeks the following relief:

> (1)     A declaratory judgment stating that the acts of North Central and/or its former employees, Simnioniw and Hilderman, are not covered and/or otherwise excluded from coverage under the Acuity policy, and therefore that Acuity owes no duty to defend or otherwise indemnify North Central in connection with the Thomas lawsuit.
>
> (2)     Its costs and disbursements, and such other relief as the Court deems just and proper.

Thomas, NCV, and Hilderman answered Acuity's second amended complaint and requested a declaration that coverage exists under the policy.  Simnioniw did not answer - undoubtedly on account of his settlement agreement with Thomas, which at that point had released him of all claims.

While this action was pending, Acuity  extended a defense to NCV in the state action subject to a reservation of rights.  Acuity did not defend either Simnioniw or Hilderman.

Acuity filed a motion for summary judgment in this case shortly before the trial in the state-court action. After determining that Acuity would not be subjected to any additional expense in connection with the state-court trial (since it was not defending Simnioniw and Hilderman and NCV had already been effectively dismissed), the court deferred consideration of Acuity's motion until after the state-court trial. Subsequently, NCV and Thomas have also filed cross-motions for summary judgment.

On January 16, 2007, Acuity moved for default judgment as to Simnioniw, but no judgment was entered prior to Simnioniw assigning his rights under the Acuity policy to Thomas. Thomas, who has been a party to the declaratory proceeding from virtually the beginning, has asserted in her answer that there is coverage under the Acuity policy for the other defendants.

On May 3, 2007, the court held a conference call with the parties and advised them of the undersigned's tentative conclusion that there was no coverage under Acuity's policy for either Simnioniw or Hilderman, but that the policy was ambiguous regarding the application of the employment-related practices exclusion as to NCV. The court allowed the parties an opportunity to indicate whether there was any relevant extrinsic evidence material to that ambiguity and no relevant extrinsic evidence was proffered.

## II.   GOVERNING LAW

### A.   Law applying to this action generally

Since this is a diversity action, state law governs with respect to all substantive matters, including the interpretation of Acuity's insurance contract. National Union Fire Ins. Co. of Pittsburgh v. Terra Indus., Inc., 346 F.3d 1160, 1164 (8th Cir. 2003). Other issues, however, are governed by 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, and not by state law. See Wilton v. Seven

Falls Co., 515 U.S. 277, 286-288 (1995); see generally C. Wright, A. Miller, & M. Kane Federal

Practice and Procedure: Civil 3d § 2756 (1998).  This includes the question of whether declaratory

relief should be granted - an issue that is subject to the prudential considerations of federalism,

comity, and efficiency.  See, e.g., Scottsdale Ins. Co. v. Detco Industries, Inc., 426 F.3d 994, 997-

1000 (8th Cir. 2005); Penn-American Ins. Co. v. Coffey, 368 F.3d 409, 412-413 (4th Cir. 2004).

### B.    Applicable North Dakota law

The interpretation of an insurance contract, including whether it is ambiguous, is a question

of law for the court. Fisher v. American Family Mut. Ins. Co., 1998 ND 109, ¶ 5, 579 N.W.2d 599.

The North Dakota Supreme Court has summarized the standards for construing insurance contracts

as follows:

> Our goal when interpreting insurance policies, as when construing other contracts, is to give
> effect to the mutual intention of the parties as it existed at the time of contracting. We look
> first to the language of the insurance contract, and if the policy language is clear on its face,
> there is no room for construction. If coverage hinges on an undefined term, we apply the
> plain, ordinary meaning of the term in interpreting the contract. While we regard insurance
> policies as adhesion contracts and resolve ambiguities in favor of the insured, we will not
> rewrite a contract to impose liability on an insurer if the policy unambiguously precludes
> coverage. We will not strain the definition of an undefined term to provide coverage for the
> insured. We construe insurance contracts as a whole to give meaning and effect to each
> clause, if possible. The whole of a contract is to be taken together to give effect to every part,
> and each clause is to help interpret the others.

Farmers Union Mut. Ins. Co. v. Decker,  2005 ND 173, ¶ 4, 704 N.W.2d 857 (Decker) (quoting

Ziegelmann v. TMG Life Ins. Co., 2000 ND 55, ¶ 6, 607 N.W.2d 898).

An insurer has both a duty to defend and a duty to indemnify under a liability insurance

policy, such as the one at issue in this case.  The duty to defend is broader than the duty to

indemnify. Decker, 704 N.W.2d at 863. Generally speaking, the duty to defend is determined

primarily by comparing what is pled in the complaint to the provisions of the insurance policy, and

the duty exists  if there is a "potential" for liability and the "possibility" of coverage with respect to even one claim, with all doubts to be resolved against the insurer.  E.g., Decker, 2005 ND 173 at ¶ 14,; Nodak Mut. Ins. Co. v. Heim, 1997 ND 36, ¶ 11, 559 N.W.2d 846.

## III.   COVERAGE ISSUES - SIMNIONIW AND HILDERMAN

### A.   Hilderman

Hilderman has appeared in this action, but has not responded to Acuity's motion for declaratory judgment.  Under Local Rule 7.1(C), this is deemed to be an admission that the motion is well taken.  Also, Thomas acknowledges that Hilderman is not entitled to coverage.  More specifically, she concedes that Hilderman was an employee and that he caused her personal injuries while she was in the course of her employment.  Under paragraph 2(a)(1)(a) of the section "Who Is An Insured," an employee who is an additional insured does not have coverage for either bodily or personal injuries inflicted upon co-employees in the course of their employment.  Consequently, the court will enter an order declaring Acuity has no duty to indemnify Hilderman.

### B.   Simnioniw

Simnioniw has failed to appear and respond to Acuity's complaint and an order for default judgment has been entered as to him by Senior Judge Conmy.  Acuity argues that Simnioniw's default is also binding upon Thomas and that she lacks standing to contest the coverage issues with respect to Simnioniw as a result.  The court will address the standing issue before proceeding to address the coverage defenses.

#### 1.   Acuity's claim of  lack of standing

The Declaratory Judgment Act authorizes federal courts to declare the rights of interested parties "[i]n a case of actual controversy" 28 U.S.C. § 2201.  The requirement of an "actual

controversy" is imposed by Article III of the Constitution. See Steffel v. Thompson, 415 U.S. 452, 458 (1974); Diagnostic Unit Inmate Council v. Films, Inc., 88 F.3d 651, 653 (8th Cir.1996).  "In general, an actual controversy is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Diagnostic Unit Inmate Council v. Films, Inc., 88 F.3d 651, 653 (8th Cir.1996) (quoting Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941)).  In other words, to seek a declaratory judgment, the plaintiff's claims must be ripe. Gopher Oil Co. v. Bunker, 84 F.3d 1047, 1050 (8th Cir.1996).  The ripeness doctrine requires that "before a federal court may address itself to a question, there must exist a real substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." Nebraska Public Power District v. MidAmerican Energy Co., 234 F .3d 1032, 1038 (8th Cir.2000)(internal quotations omitted).

In an action under the federal Declaratory Judgment Act, the question of standing is determined by looking at federal rather than state law. Miller v. Augusta Mut. Ins. Co., 157 Fed. Appx. 632, 636 (4th Cir. 2005); Modern Equip. Co. v. Cont'l W. Ins., 146 F. Supp. 2d 987, 990 (S.D. Iowa 2001).  It has been long since established that, as a matter of federal law, an actual controversy exists between an injured third party, who is not a party to the insurance contract, and a plaintiff insurance company. Maryland Cas. Co. v. Pac. Coal & Oil  Co., 312 U.S. 270, 274 (1941).  In Maryland, the Court found a substantial controversy existed between the injured party and the insurer despite the fact that the underlying state-court action had not yet been concluded. Id. at 271-72. The Eighth Circuit has reaffirmed that an injured party  with a possible claim against an insurer who has been made a party to a declaratory judgment action in federal court has standing and must

be allowed to participate in the action. <u>Automobile Underwriters v. Graves</u>, 489 F.2d 625, 628 (8th Cir. 1973).  The Seventh and Third Circuits have also ruled that the injured party has standing to remain in the suit even if the insured has been dismissed. <u>Fed. Kemper Ins. Co. v. Rauscher</u>, 807 F.2d 345 (3rd Cir. 1986); <u>Hawkeye-Security Ins. Co. v. Schulte</u>, 302 F.2d 174 (7th Cir. 1962).

In this case, Acuity, quite properly, named Thomas as an additional party defendant, presumably so that she would be bound by any coverage determinations. Hence, there is no standing issue.

### 2.    Simnioniw had no coverage under the Acuity policy

Acuity argues that Simnioniw has no personal claim for indemnity from Acuity because he made no appearance and that his "default" is binding upon Thomas.  Thomas, argues, however, that she acquired Simnioniw's rights under the policy by virtue of an assignment prior to any default judgment being entered.  Moreover, aside from the assignment, Thomas argues she would have had the right to ultimately garnish on the policy in state court and that the coverage issue should be resolved now because Acuity has elected to make her a party to this action.

After considering the arguments of the parties, the court need not address the more complicated issue of whether Thomas can now assert an argument for coverage given the various iterations of the settlement agreements with Simnioniw, as well as their timing.  This is because it is clear that Simnioniw had no claim for coverage in the first instance.

Despite conceding that the "co-employee exclusion" denies Hilderman coverage,  Thomas argues that Simnioniw was in a different position because he was the manager of the video store. Thomas agues that  Simnioniw is an insured under paragraph (1)(c) of "Who Is An Insured," rather than paragraph (2)(a) that applied to Hilderman.  Paragraph (1)(c) provides coverage for "managers"

10

and does not have a "co-employee exclusion" like paragraph (2)(a).  The relevant portions of the

policy are the following:

**WHO IS AN INSURED**

1.     If you are designated in the Declarations as:
   a.     An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.
   b.     A partnership or joint venture, you are an insured.  Your members, your partners and their spouses are also insureds, but only with respect to the conduct of your business.
   c.     A limited liability company, you are insured.  Your members are also insureds, but only with respect to the conduct of your business.  Your managers are insureds, but only with respect to their duties as your managers.
   d.     An organization other than a partnership, joint venture, or limited liability company, you are an insured.  Your *executive officers* and directors are insureds, but only with respect to their duties as your officers or directors.  Your stockholders are also insureds, but only with respect to their liability as stockholders.
2.     Each of the following is also an insured:
   a.     Your *employees* other than either your *executive officers* (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.  However, none of these *employees* is an insured for:
      (1)     *Bodily injury* or *personal injury*:
         (a)     To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company) or to a co-*employee* while that co-*employee* is either in the course of his or her employment or performing duties related to the conduct of your business;

Thomas's reliance upon Paragraph (1)(c), however, is misplaced for two reasons.  First,

Paragraph (1)(c) applies only to limited liability companies and NCV is a limited liability limited

partnership, not a limited liability company under North Dakota law.   Compare N.D.C.C. § 45-23-

01 *et seq*. and N.D.C.C. § 10-32-01 *et seq*.

Second, even if Paragraph (1)(c) applied, Simnioniw was not a "manager" within the

meaning of Paragraph (1)(c).  Under limited liability company law in general, and North Dakota's

law in particular, a "manager" is a statutorily-created position that is the equivalent of a chief

operating officer or managing partner. N.D.C.C. § 10-32-02 (39); see generally NTS Am. Jur. 2d

11

Limited Liability Companies §§ 3, 6 (2007).  In other words, the term does not apply to subordinate employees who, for example, may be store managers like Simnioniw.

While Acuity's policy does not explicitly make this distinction, the language used in Paragraphs (1) and (2)(a) of "Who Is An Insured" makes clear this is what was intended.  Paragraph (1) broadens the scope of Acuity's policy to extend coverage beyond the named insured to include, depending upon the form of business of the named insured, partners of partnerships, members of limited liability companies, and stockholders of corporations.  It also extends coverage to certain executive or managing officers of the various entities.  In contrast, Paragraph (2) extends coverage to "employees" of the named insured, but excludes the employees who are covered in Paragraph (1) by virtue of their ownership or executive positions.  Thus, when considering the language of Paragraphs (1) and (2) as a whole, it is clear that Simnioniw was not one of the persons entitled to coverage under Paragraph (1) and that he was simply an employee within the meaning of Paragraph (2)(a) of "Who Is An Insured."[2]  Consequently, the "co-employee exclusion" defeats any claim for coverage by Simnioniw.

Moreover, even before getting to the "co-employee exclusion," employees under paragraph 2(a) of "Who Is An Insured" have coverage only for acts committed within the scope of their employment or while performing duties related to the conduct of the named insured's business.  In this case, the state-court jury found that Simnioniw and Hilderman were acting in concert with the caller to carry out the hoax that occurred.  Under North Dakota law, a finding of concerted action

_____

[2]  NCV is treated as a corporation under the "Declarations" page of Acuity's policy. Under Paragraph (1) of the section "Who Is An Insured," there is not a specific subparagraph that applies to limited liability limited partnerships. Under Paragraph (1)(d) applying to entities other than a partnership, joint venture, or limited liability company, the listed additional insureds are "executive officers," "directors," and "stockholders." Simnioniw does not fall within any of these categories.  The only other possibility is Paragraph (1)(b), which applies to partnerships.  Under that paragraph, the only additional insureds are members, partners, and their spouses.  Clearly, Simnioniw does not fall within any of these categories, either.

requires "evidence manifesting a common plan to commit a tortious act where the participants knew of the plan and its purpose and took substantial affirmative steps to encourage the achievement of the result. <u>Schneider v. Schaaf</u>, 1999 ND 235 at ¶ 23.  Consequently, the jury necessarily concluded that Simnioniw and Hilderman were knowingly involved in the hoax.  Given this finding, it is doubtful that either Simnioniw or Hilderman would have been entitled to coverage, even in the absence of the "co-employee exclusion."

Based on the foregoing, Acuity is entitled to a declaration that it owes no obligation to indemnify Thomas or Hilderman for any liability of Simnioniw and Hilderman in the state-court action.

## IV.    COVERAGE ISSUES - NCV

All of the claims against NCV were dismissed by the state court prior to trial, including the claims of negligent hiring and failure to train.  Thomas has now filed an appeal contesting the dismissal of these claims.  It appears she may also be claiming that the state court erred when it refused to allow her to amend her suit to assert a claim against NCV for *respondeat superior* liability.  Prior to NCV's dismissal from the action, Acuity provided NCV with a defense subject to a reservation of rights.

### A.    Acuity's mootness argument

Acuity filed a motion for summary judgment on the eve of the state-court trial seeking a declaration that there was no coverage for NCV, Simnioniw, and Hilderman.  After NCV cross-moved for summary judgment, Acuity attempted to claim that its request for declaratory relief became moot because Thomas's time for appealing from the dismissal of NCV from the state-court action had passed.

Under North Dakota law, an order adjudicating the rights and liabilities of fewer than all the parties is not a final appealable order in the absence a certification by the trial court that the order is a final judgment. N.D. R. Civ. P. 54(b).   In this case, Acuity provided no evidence that the state-court judge certified the order dismissing Acuity as being a final judgment.   Consequently, it does not appear that the time for appeal expired based upon Acuity's argument of when the time period for appeal commenced.

In any event, the court understands that the appeal is still pending.   Consequently,  NCV remains exposed to potential liability until that appeal is resolved in its favor.   Further, there remains also the issues of NCV's continued right to a defense on appeal, see Petrol Industries, Inc. v. Gearhart-Owen Industries, Inc., 424 So.2d 1059, 1065 (La.App.1982), as well as its claim for attorney's fees, both of which are dependent upon it prevailing in this action.   The court rejects Acuity's argument that the matter is moot.

### B.    Coverage for claims for "personal injury"

Acuity's policy provides coverage for damages for both "bodily injury" and "personal injury."   The following is the relevant policy language:

**LIABILITY AND MEDICAL EXPENSES COVERAGES**

1.    **Business Liability**

    a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of *bodily injury, property damage, personal injury or advertising injury* to which this insurance applies. We will have the right and duty to defend the insured against any *suit* seeking those damages. However, we will have no duty to defend the insured against any *suit* seeking damages for *bodily injury, property damage, personal injury* or *advertising injury* to which this insurance does not apply.

    \* \* \* \*

    b.    This insurance applies:

        (1)    To *bodily injury* or *property damage* only if:

            (a)    The *bodily injury* or *property damage* is caused by an *occurrence* that takes place in the coverage territory; and

            (b)    The *bodily injury* or *property damage* occurs during the policy period.

        (2)    To:

14

(a)    *Personal injury* caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

\* \* \* \*

but only if the offense is committed in the *coverage territory* during the policy period.

\* \* \* \*

### LIABILITY AND MEDICAL EXPENSE DEFINITIONS

\* \* \* \*

3.    *Bodily injury* means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

\* \* \* \*

13.    *Personal injury* means injury, other than *bodily injury*, arising out of one or more of the following offenses:

    a.    False arrest, detention or imprisonment;

    b.    Malicious prosecution;

    c.    The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, by or on behalf of its owner, landlord or lessor;

    d.    Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

    e.    Oral or written publication of material that violates a person's right of privacy.

All of the parties have now conceded that Thomas did not suffer a "bodily injury" within the meaning of the policy.[3]  Consequently, the court need not address Acuity's arguments for why there is no "bodily injury" coverage.

Turning to the policy provisions providing coverage for "personal injury," it appears that two criteria must be met to find coverage, absent any applicable exclusions.  The first is that the act giving rise to the damage must fall within the definition of "personal injury" as set forth above.  In this case, there is no question that Thomas suffered a "personal injury" as defined by the policy.  The definition specifically includes an injury, other than bodily injury, that arises out of the "offense"

---

[3]  In this context, "bodily injury" is commonly understood to mean  physical harm or damage.  <u>See</u>, <u>e.g.</u>, <u>LDF Food Group, Inc. v. Liberty Mut. Fire Ins.</u>, 146 P.3d 1088,1092 (Kan. Ct. App. 2006) (pure emotional injury does not constitute bodily injury); <u>Black's Law Dictionary</u> 789 (7th ed. 1999). In this case, there was no evidence of any physical harm to Thomas, such as a cut, bruise, or broken bone.  Rather, all of her claimed injuries were emotional injuries.

of "false imprisonment," and the state-court jury in this case returned a verdict for Thomas on her false imprisonment claim.

The second criteria for "personal injury" coverage is contained in paragraph (1)(b) of the coverage section entitled "Liability and Medical Expenses Coverages," which is that the "offense" giving rise to the coverage must have arisen out of the insured's business.  Acuity argues that the actions of Simnioniw and Hilderman were intentional and, therefore, could not have arisen out of NCV's business.  In support of this argument, Acuity cites Consolidated Inv. Corp. v. Kemper Ins. Co., 1999 WL 1314677 (Ohio App. 11th Dist.1999) (Consolidated).

The coverage dispute in Consolidated grew out of the strip search of two female restaurant employees by their supervisor after receiving a telephone call from a person posing as a sheriff's deputy.  When the insurer refused to defend the resulting lawsuit, the restaurant brought a declaratory judgment action against the insurer in an attempt to force the insurer to defend. Id. at *1. The claims in the underlying lawsuit included *respondeat superior* and false imprisonment, and the insurance policy contained language nearly identical to the policy language in the present case. Id. at *1-2.  The court in Consolidated concluded there was no coverage for the restaurant.  The court's explanation was that, if the manager's purpose in strip searching the employees had been to identify a thief, then his conduct would not have amounted to false imprisonment,[4] and, if his purpose was to view the female employees naked, then there was no possible advancement of the restaurant's "pecuniary or business interests." Id. at *2.

---

[4]   It would seem that there could be situations in which the store manager's purpose may be to identify a thief, but the manner in which the search is conducted, either initially or at some point during its progression, amounts to false imprisonment.  Under North Dakota law, the tort of false imprisonment or detention can arise when a person is detained by another pursuant to a show of authority and the person allegedly detained reasonably believes he or she is not free to leave.  See NDJI C-11.00.

While Consolidated may be on point and supportive of Acuity's position, the court does not find it to be persuasive for several reasons. The court in Consolidated did not provide any citation for the "pecuniary or business interest" test it applied. Moreover, the policy in Consolidated, like the policy in this case, simply required that the offense arise out of the insured's business, not that the offense must satisfy a pecuniary or other interest of the business. This distinction is important for two reasons.

First, in some jurisdictions, an employer can be held vicariously liable for a supervisor's intentional torts, even when the supervisor was not advancing the interests of the employer, at least in certain situations. E.g., Doe v. Forrest, 2004 VT 37, ¶¶ 20-49, 853 A.2d 48; cf. Faragher v. City of Boca Raton, 524 U.S. 775, 801-804 (1998); see generally Restatement of Agency (Third) §§ 7.03(2)(b) & 7.08; Restatement of Agency (Second) § 219(2)(d). The reasonable expectation of an insured employer, when purchasing coverage for offenses such as false imprisonment, malicious prosecution and defamation, is that this vicarious liability would be covered if it arose out of the employer's business.[5]

Second, North Dakota applies the "causal connection test" when construing the phrase "arising out of" in an insurance policy. Grinnell Mut. Reinsurance Co. v. Center Mut. Ins. Co., 2003 ND 50, 658 N.W.2d 363. As explained by the North Dakota Supreme Court, the causal connection test is broad and comprehensive in scope. Id. at ¶ 12. The causal relationship need not constitute the proximate cause, but, if there is some intervening or independent cause, the test will not be satisfied. Id.; Houser v. Gilbert, 389 N.W.2d 626, 627 (N.D. 1986) (finding the causal connection

---

[5]   Whether North Dakota law imposes this broad of liability upon an employer for acts of a supervisor is another matter. See N.D.C.C. § 3-03-09. But, this is an issue more properly resolved in the state-court action, if it is reached.

test was satisfied where mud fell off one truck, left the roadway slippery, and caused the driver of another truck to lose control); Transamerica v. Farmers Ins. Exch., 463 N.W.2d 641, 642 (N.D. 1990) (finding the causal connection test satisfied and dog owner's automobile insurance policy triggered where a dog in the back of a pickup truck bit a pedestrian).  A remote connection also will not satisfy the test. Grinnell, 2003 ND 50 at ¶ 12; Norgaard v. Nodak Mut. Ins. Co., 201 N.W.2d 871, 874 (N.D. 1972) (finding accidental shooting where automobile was used as a bench rest did not arise out of use of the automobile and automobile insurance policy did not provide coverage).


In the present case, the false imprisonment and strip search took place during store hours, on store property, and while Thomas was working.  An integral part of the scheme was that the search be conducted by someone in authority at the store - in this case the manager, who was called in to conduct the search.  Arguably, the false imprisonment would not have occurred "but for" the option of the strip search being conducted by an NCV supervisor and Thomas submitting to her supervisor's apparent authority.  Under these circumstances, the requisite causal connection and nexus to the insured's business exits.  Cf. Nautilus Ins. Co. v. Gardner, 2005 WL 664358, *5 (E.D.Pa. 2005) (holding the "causal connection test" satisfied in when a supervisor sexually assaulted a female employee of a haunted house given that the assault took place while the victim was working and, but for this fact, would not have occurred).

Finally, Acuity argues that there can be no coverage for NCV because the injury was the result of intentional acts, regardless of whether or not they arose of the NCV's business and cites to the case of Northwest G.F. Mut. Ins. Co. v. Norgard, 518 N.W.2d 179 (N.D. 1994).  However, Northwest is not on point. Northwest dealt with a broadly-worded exclusion that was held to trump

the coverage-granting provisions of the policy in that case.  And, as will be discussed below, there are no relevant exclusions in this case as broad as the one at issue in <u>Northwest</u>.[6]

Morever, in this case, the policy specifically grants coverage for "offenses," including false imprisonment, that are  intentional torts.  If the court accepted Acuity's argument that intentional wrongful conduct could never arise out of NCV's business, then the coverage for personal injury would be rendered illusory.  Surely, Acuity did not include false imprisonment and the other intentional torts without any expectation of providing coverage.

## C.     Policy exclusions

In addition to arguing that there is no grant of coverage, Acuity argues that coverage for NCV is precluded by several policy exclusions.

### 1.     Exclusion for expected or intended injuries

One of the exclusions that Acuity relies upon is the exclusion for "expected or intended injury" set forth in Paragraphs (1)(a) of the "Exclusions" portion of the policy, which reads as follows:

> **EXCLUSIONS**
> 1.     **Applicable to Business Liability Coverage**
> **This Insurance does not apply to:**
>    a.     Expected or Intended Injury
>           Bodily injury or property damage expected or intended from the standpoint of the insured.  This exclusion does not apply to bodily injury resulting from the use of reasonable force to protect persons or property.

---

[6] In <u>Northwest</u>, the insured operated a home daycare business at her residence.  She and her husband insured the business under a home daycare endorsement to their homeowner's policy, which contained a sexual molestation exclusion. 518 N.W.2d at 180.  After the insured's husband allegedly molested a child at the daycare, a lawsuit ensued, and the insurer brought a declaratory judgment action seeking to avoid coverage on account of the sexual molestation exclusion. In the declaratory action, the wife argued that she should be covered because she was a separate insured under the policy and the only claims made against her were for negligence.  The court rejected this argument on the grounds that:  the focus of the exclusion was the injury, not the pleaded cause of action; the injuries clearly arose out of the molestation; and the fact the specific language of the exclusion extended not only to acts of the insured, but also to the acts of "an insured's employee or any other person involved in any capacity in the day care enterprise. . . ."  <u>Id.</u> at 183-184.

* * * *
p.   Personal or Advertising Injury
     * * * *
     (3)   Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured;

By its very terms, however, this exclusion applies only to coverage for "bodily injury" and "property damage."  As already noted, everyone now agrees that the only claim that is made in this case is for "personal injury" and not "bodily injury" as defined by the policy.

## 2.     Exclusion for willful violations of a penal statute

Acuity also argues the exclusion for willful violations of a penal statute or ordinance under Paragraph (1)(p)(3) of the "Exclusions" portion of the policy.  While this exclusion does apply to "personal injury" coverage, it is limited to willful violations of penal statutes or ordinances that are committed "by or with the consent of the insured."   And, while Hilderman and Simnioniw were convicted of the municipal offense of disorderly conduct, there is no claim or finding that NCV, as a separate insured, committed or consented to the violation.  Consequently, this exclusion does not apply.

## 3.     Employment-Related Practices (ERP) Exclusion

### a.     Relevant policy language

Acuity further argues the employment-related practices exclusion ("ERP exclusion") precludes coverage for NCV.  In pertinent part, the ERP exclusion reads as follows:

**EMPLOYMENT-RELATED PRACTICES EXCLUSION**

This insurance does not apply to *bodily injury* or *personal injury* to:
1.   A person arising out of any:
     a.   Refusal to employ that person;
     b.   Termination of that person's employment; or
     c.   Employment-related practices, policies, acts or omissions such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person;
     * * * *

### b.   Acuity's argument for application of the exclusion

Acuity's argument for why the ERP exclusion applies is that: (1) the language of subparagraph (1)(c) excludes any "employment-related practices, policies, *acts* or *omissions*" (emphasis added); (2) the injury to Thomas was "employment-related," in the sense that the injury occurred while she was at work and was the result of acts committed by her immediate supervisor; and (3) the "arising out" language casts a broad net in terms of causal relationship for reasons already discussed.  Of all of Acuity's arguments for why NCV has no coverage, this one has the most merit, primarily because Acuity's construction of the ERP exclusion is plausible and there is case law supporting it.

One of the cases that Acuity relies upon in its brief is the Eighth Circuit's decision in Capitol Indemnity Corp. v. 1405 Associates, 340 F.3d 547 (8th Cir. 2003) (Capitol Indemnity).  In that case, the Eighth Circuit held that an identical ERP exclusion covered claims of false arrest, false imprisonment, slander, wrongful termination and other claims arising out of an employer's report to authorities that its hotel manager had not turned over rent receipts that she had collected prior to her leaving her employment.  The court, applying Missouri law, held that the alleged false arrest, false imprisonment, and slander all arose out of her employment and that virtually any claim arising out of the employment relationship is covered by the exclusion.   In reaching this conclusion, the court relied principally upon the fact that the term "arising out of" under Missouri law provides a broad causation standard similar to North Dakota's law, as previously discussed.  Id. at 550-551.

Acuity also cites to  LDF Food Group, Inc. v. Liberty Mut. Fire Ins., 146 P.3d 1088 (Kan. Ct. App. 2006) (LDF Food Group).  In LDF Food Group, a prank caller made an allegation of theft that resulted in a strip-search and other acts of humiliation almost identical to what happened in this

case.  The Kansas Court of Appeals  held the same ERP exclusion applied, but for a different reason than expressed by the Eighth Circuit in <u>Capitol Indemnity</u>.  The Kansas court concluded that the acts causing the emotional injury were acts or omissions within the meaning of paragraph (1)(c), which the court noted included harassment and humiliation, and that the exclusion was not limited to employment-related policies or practices.  <u>Id.</u> at 1094-95.[7]

Still another case that has found the ERP exclusion to apply with respect to acts of malicious prosecution and defamation for essentially the same reasons as in <u>LDF Food Group</u> is <u>State National Ins. Co. v. Affordable Homes of Troy, LLC</u>, 368 F. Supp. 2d 1281 (M.D. Ala. 2005).

### c.      The equally plausible narrower interpretations

There are, however, narrower constructions of the exclusion language that are equally plausible and that, arguably, result in the exclusion not applying.  Moreover, there is case law supporting these interpretations, as well.  <u>E.g.</u>, <u>Peterborough Oil Company, Inc. v. Great American Ins. Co.</u>, 397 F. Supp. 2d 230 (D.Mass. 2005) (discussing a number of the cases) (<u>Peterborough Oil</u>); <u>Zurich v. Smart & Final, Inc.</u>, 996 F. Supp. 979 (C.D. Cal. 1998) (<u>Zurich</u>).  In fact, the court in <u>Peterborough Oil</u> canvassed the cases that had been decided up to the point of the decision in that case and concluded the majority favored a narrower interpretation.  397 F. Supp. 2d at 239-240.

To understand the narrower constructions, it is necessary to first review the overall structure of the exclusion.  Beginning first with the title, the exclusion makes reference to "employment-related *practices*" (emphasis added). Then, turning to its text, the exclusion states there is no coverage for  bodily and personal injury arising out of two very specific acts:  "refusal to employ

---

[7]  In reaching its decision, the court in <u>LDF Food Group</u> assumed that the managerial  personnel conducting the search actually believed the call came from the police, which is not the situation here.  368 F. Supp. 2d <u>at</u> 1090.

that person" under paragraph (1)(a) and "termination of that person's employment" under (1)(b). Next, there is, what appears to be, a "catch-all" in (1)(c), which further excludes any "employment-related practices, policies, acts, and omissions" and then lists the following specific examples: "demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person." Notably, the list does not include "false imprisonment" or "malicious prosecution." Courts favoring the narrower interpretations have commented on the particular structure and language of the exclusion and have raised the following issues: If the intent of the exclusion was simply to exclude coverage for employer acts or omissions directed to an employee and occurring during the course of employment, which is essentially Acuity's argument, why use the peculiar structure of referring to two very specific personnel actions in (1)(a) and (1)(b) followed by the more general language in (1)(c)? Also, why refer specifically to employment-related "practices" in both the title of the exclusion and then again in the "catch-all" in (1)(c) along with the specific term "policies" in (1)(c)? Why not simply state that excluded from coverage are all bodily and personal injuries suffered by an employee or prospective employee and arising out of acts of the insured or its other employees, if that is what was intended? Finally, since the coverage for personal injuries includes coverage for false imprisonment, malicious prosecution, and defamation, and since the exclusion lists a long list of items in (1)(c) including defamation, why omit reference to false imprisonment and malicious prosecution if these were also intended as employment-related acts to be excluded? Peterborough Oil, 397 F. Supp. 2d at 237-243; Zurich, 996 F. Supp. at 988.

One case raising these issues is Peterborough Oil, which involved a claim for malicious prosecution brought against the insured owner of a convenience store by a former store manager.

In that case, the insured owner accused the store manager of theft and persisted in a demand for criminal prosecution even after the manager made available video-tape evidence indicating the theft was the work of another employee.

In addressing the insurer's argument that an ERP exclusion identical to the one involved in this case excluded coverage for the malicious prosecution claim, the court in Peterborough Oil raised many of the above questions and concluded that the broad interpretation placed upon the exclusion language by the Eighth Circuit in Capitol Indemnity was not the only plausible interpretation and that a narrower interpretation of the language was equally plausible for two reasons. First, the court observed the peculiar language of the exclusion in terms of the two specific personnel-related acts in (1)(a) and (1)(b) followed by the more general exception for "employment-related" acts and omissions. After noting that the term "employment-related" was not defined by the policy, the court concluded that commonsense requires looking to what precedes the term and what follows to derive its meaning within the context of the exclusion, and that, when one does so, a plausible construction of the language is that it covers a range of acts narrower than simply all acts "arising out of employment," as suggested by the Eighth Circuit.   The court stated the following:

> The phrase "employment-related act or omission" is not defined in the policy. As an initial matter, it seems clear that "employment-related" cannot be synonymous with "related to an employee" or "involving an employee." A corporate employer can only act through human agents, principally its employees. If every injury arising out of an act that somehow related to an employee were to be excluded, the exclusion would effectively swallow the coverage. The term is therefore necessarily narrower.
> For similar reasons, the term "employment-related" cannot mean either "undertaken by an employee in the course of employment" or "occurring to an employee in the course of employment." The former interpretation would exclude virtually all coverage; again, a corporation can only act through its employees and agents. The latter would exclude virtually all claims brought by employees; while that interpretation is certainly narrower than a total exclusion, it is nonetheless quite sweeping, and achieves that end by a convoluted path. It would be simple enough to

provide that "all claims brought by employees are excluded," if that was the intent of the drafters.

What, then, would the insured reasonably expect the term "employment-related" to mean in this context? One clue lies in the nine examples of "employment-related" acts or omissions (or practices or policies) set forth in the exclusion: coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, and discrimination. That list consists almost entirely of events that concern the relationship between an employer and an employee - in other words, not events in the workplace generally, or events concerning the job duties of an employee, but events concerning personnel management, employee discipline, and similar matters. A second clue derives from the two other provisions of the exclusion, one of which excludes injuries arising out of a "refusal to employ" a person (i.e., hiring), and one of which excludes injuries arising out of the "termination of [a] person's employment" (i.e., firing).

Taken together, both clues strongly suggest the common-sense conclusion that the term "employment-related" has a relatively narrow meaning: it is intended to refer to matters that directly concern the employment relationship itself, such as the demotion, promotion, or discipline of employees by employers, and tortious acts that may accompany such personnel decisions, such as discrimination, harassment, or defamation. Conversely, it is not intended to refer to all matters that concern or relate to employees.

Peterborough Oil, 397 F. Supp. 2d at 238-239.  The second reason why the court found a narrower

construction of the language to be plausible was the fact that the policy in that case (as the policy

in this case) specifically granted coverage for the offenses of malicious prosecution, false

imprisonment, and defamation under the "personal injury" coverage, but the ERP exclusion made

no reference to malicious prosecution or false imprisonment, even though it included a long list of

other specific acts to be excluded, including defamation. Id. at 242-243.

After concluding that a narrower construction of the exclusion was equally plausible to the

Eighth Circuit's construction in Capitol Indemnity,[8] the court in Peterborough Oil concluded the

---

[8]  The court had this to say about the Eighth Circuit's decision in Capitol Indemnity:

The Eighth Circuit in Capitol Indemnity noted that the injury at issue arose out of the employee's "employment with" the hotel, without elaboration. But, as noted above, the term "employment-related act" requires that the act directly concern the employment relationship, not merely the fact of employment. See Lawson v. Straus, 673 So.2d at 227. The court did not explain how the relevant "act" (the report causing the arrest) related to the employment relationship. Or, to put it another way, the broad interpretation given by the court to the phrase "arising out of" begs the

exclusion was ambiguous.   As a consequence, the court held it was required, in applying Massachusetts law, to construe the exclusion strictly against the insurer and favor the narrower interpretation, the result of which was the determination that the exclusion did not apply and that the insured had coverage for the claim of malicious prosecution.  Id. at 243.[9]

Another case favoring a narrower interpretation is the California federal district court's decision in Zurich.  In that case, the insured's loss prevention manager transported a store employee to a motel where the employee was placed in a room and interrogated about alleged inventory shortages. The employee later sued for false imprisonment and a number of employment-related claims.  The court in Zurich rejected the insurer's argument that there was no coverage concluding that the exclusion was ambiguous given the fact that it did not specifically exclude false imprisonment.   Specifically, the court in Zurich stated:

> Here, the exclusion language cited by Zurich is not "plain and clear." Specifically, Zurich relies on the "catch-all" phrase "or other employment-related practices, policies, acts or omissions" to bring itself within the employment-related practices exclusion to Coverage B. In a case remarkably similar to this action, the Ninth Circuit recently reversed a grant of summary judgment in favor of the insurer based on this same employment-related practices exclusion, noting:
>> Read literally and broadly the terms 'arising out of' and 'employment-related ... acts or omissions' would include any claim or injury connected in any way with employment termination, no

---

question, "arising out of what?"
Peterborough Oil, 397 F. Supp. 2d at 241 n.12.

[9]  In particular, the court stated:
The exclusion is therefore ambiguous, both because the malicious prosecution in this instance reasonably could be said to be an employment-related act, or not, and because the coverage definition specifically includes "malicious prosecution" but the exclusion does not. As stated above, exclusions must be read narrowly, and any ambiguities in an exclusion are construed strictly against the insurer. Brazas Sporting Arms, 220 F.3d at 4-5. Accordingly, the court agrees with the weight of the case law, and concludes that the "employment-related act or omission" exclusion does not apply to the act of malicious prosecution in this case.
Peterborough Oil, 397 F. Supp. 2d at 243.

> matter how attenuated that connection. We do not think the parties
> mutually intended the exclusion to be read so expansively.
>
> HS Services, Inc., 109 F.3d at 645 (emphasis added).
>
> Moreover, following as it does specific examples of employment-related conduct excluded from coverage, the "catch-all" phrase does not plainly and clearly show that the exclusion applies to a false arrest or imprisonment claim, for which coverage is provided. HS Services, Inc., 109 F.3d at 646; Adler v. Western Home Ins. Co., 878 F.Supp. 1329, 1334 (C.D.Cal.1995). Rather, as applied to a false arrest or imprisonment claim, the undefined phrase "other employment-related practices, policies, acts or omissions" is ambiguous. Feurzeig, 59 Cal.App.4th at 1282, 69 Cal.Rptr.2d 629; HS Services, Inc., 109 F.3d at 646. That is, the policy defines "personal injury" coverage (Coverage B) as including "false arrest, detention or imprisonment" and other specifically enumerated conduct. The exclusion then specifically excludes employment-related conduct, such as defamation, from Coverage B, but does not specifically exclude false arrest or imprisonment from Coverage B. Thus, false arrest or imprisonment is not specifically excluded in the employment-related context, and the insured, Smart & Final, undoubtedly had a reasonable expectation of coverage for claims of false arrest or imprisonment.

Zurich, 996 F. Supp. at 988.

Other cases holding that similar ERP exclusions should be construed narrowly in analogous cases are cataloged in Peterborough Oil and need not be further discussed here. Peterborough Oil, 397 F. Supp. 2d at 239-240.[10]

### d.     ERP exclusion as applied to this case under North Dakota law

In this case, there is no dispute that Thomas was working within the scope of her employment when she received the phone call from the bogus police officer giving her the option

---

[10]  In its brief, NCV relies primarily upon Miller v. Quincy Mut. Fire Ins. Co., 2003 WL 23469293 (E.D.Pa. 2003) as authority that the ERP exclusion does not bar coverage.  In that case, an employee brought suit against her former employer and manager for negligent supervision, sexual harassment, and assault and battery arising out of the unwanted touching of her breasts and vaginal area by her manager. The insurer disclaimed any duty to defend or indemnify. Construing an ERP exclusion virtually identical to the one in the present case, the court in Miller concluded the exclusion to apply to the manager but not the employer.  The reason the court gave for not applying the exclusion to the employer was because the claim against the employer was for failure to train and supervise the manager and that this alleged failure was an employment-related practice directed at the manager, not the injured employee as required by the exclusion.  This analysis is subject to question, however, given that the focus of the ERP exclusion is the injury and its causes - not the claims that are asserted against the insured.  Cf. Northwest G.F. Mut. Ins. Co. v. Norgard, 518 N.W.2d 179 (N.D. 1994).

of going to the police department or submitting to a search conducted by the video store's manager. If the court applies the Eighth Circuit's construction of the ERP Exclusion in <u>Capitol Indemnity</u>, there is a good argument for applying the exclusion and concluding there is no coverage for NCV.

The same is not true, however, if the court applies a narrower construction to the exclusion as suggested by cases such as <u>Peterborough Oil</u> and <u>Zurich</u>. This is because, even if it were to be assumed that Simnioniw believed that what he was doing was legitimate, the acts resulting in the false imprisonment of Thomas, at most, involved an investigation of a third-party allegation of theft, which was not employment specific and which did not involve any particular employment policy or practice. <u>Cf.</u>, <u>Peterborough Oil</u>, 397 F. Supp. 2d at 242; <u>Zurich</u>, 996 F. Supp. at 988. Consequently, even if the "investigation" had been initiated with good motives, the acts that occurred would likely not be covered by the exclusion.

But, in this case, we do not even have a situation where the store manager was acting in good faith but handled the situation in a way that resulted in a tortious act of false imprisonment. The jury concluded that both Simnioniw and Hilderman were acting in concert with the caller who posed as a law enforcement officer, meaning that the entire affair was a hoax from start to finish. Hence, it appears clear that the acts causing the injury did not arise out of an "employment-related practice, policy, act, or omission," at least not in the narrower sense of that phrase.

Finally, false imprisonment is a generic intentional tort that has no particular nexus to employment. The elements of the tort do not require proof of any employment-related matter. <u>See</u> NDJI C-11.00. Further, it is not one of the well-recognized, employment-specific torts, which may be the subject of the exclusion as discussed further below.

28

Obviously, for this court, the Eighth Circuit's decision in Capitol Indemnity must be given substantial deference. But, in Capitol Indemnity, the Eighth Circuit was applying Missouri law, and since this is a diversity case, the court is obligated to follow North Dakota law. See Bockelman v. MCI Worldcom, 403 F.3d 528, 530 (8th Cir. 2005).

The parties have not cited to any North Dakota cases construing an ERP exclusion, and the court's own research has not revealed any cases. In this situation, the court is required is to make a prediction of what North Dakota law is based upon "relevant state precedent, analogous decisions, considered dicta, ...and any other reliable data." Id., quoting BoBass v. Gen. Motors Corp., 150 F.3d 842, 846-47 (8th Cir.1998).

In Fisher v. American Family Mut. Ins. Co., 1998 ND 109, ¶ 5, 579 N.W.2d 599, the North Dakota Supreme Court had this to say about the issue of ambiguity in the context of an exclusion in an insurance policy:

> An ambiguity exists when good arguments can be made for two contrary positions about the meaning of a term in a document. Sellie, 494 N.W.2d at 156.
> [¶ 6] "[A] term in an insurance policy should be construed 'to mean what a reasonable person in the position of the insured would think it meant.' " Sellie, 494 N.W.2d at 157, quoting Haugen v. Auto-Owners Ins. Co., 191 N.W.2d 274, 279 (N.D.1971). "Limitations or exclusions from broad coverage must be clear and explicit." Emcasco Ins. Co. v. L & M Devel., Inc., 372 N.W.2d 908, 911 (N.D.1985). "[W]hen the language of an insurance policy is clear and explicit, the language should not be strained in order to impose liability on the insurer." Aid Ins. Svcs., Inc. v. Geiger, 294 N.W.2d 411, 414 (N.D.1980). However, any ambiguity or reasonable doubt as to the meaning of an insurance policy is strictly construed against the insurer and in favor of the insured. Aid Ins. Svcs., Inc., 294 N.W.2d at 414; Applegren v. Milbank Mut. Ins. Co., 268 N.W.2d 114, 118 (N.D.1978). "If the language in an insurance contract will support an interpretation which will impose liability on the insurer and one which will not, the former interpretation will be adopted." Aid Ins. Svcs., Inc., 294 N.W.2d at 414. Exclusions from broad coverage in an insurance policy are strictly construed against the insurer. Johnson, 529 N.W.2d at 570. An exception to an exclusion from broad coverage results in coverage. See Dundee Mut. Ins. Co. v. Balvitsch, 540 N.W.2d 609, 611 (N.D.1995); Emcasco Ins. Co., 372 N.W.2d at 910-11; Applegren, 268 N.W.2d at 118.

1998 ND 109, ¶¶ 5-6.  And, after finding the language of the exclusion in <u>Fisher</u> to be ambiguous, the court held:

> Because exclusion j(5) will support interpretations imposing or not imposing liability, it is ambiguous, and the ambiguity must be strictly construed against the insurer and in favor of the insured. <u>E.g.</u>, <u>Aid Ins. Svcs., Inc. v. Geiger</u>, 294 N.W.2d 411, 414 (N.D.1980).

1998 ND 109, ¶ 8.

This is a very close case.  But, after careful consideration of the language of the exclusion, North Dakota law applying to interpretation of insurance policies, and the case law from other jurisdictions, the court concludes that the North Dakota Supreme Court would find that the language of the exclusion is ambiguous as applied to the facts of this case given:

- The fact reasonable arguments can be made that the exclusion does not exclude all employer acts directed at employees (or prospective employees) occurring during the course of employment (or prospective employment) based upon the particular language of the exclusion and its structure.  In particular,  the phrase  "employment-related practices, policies, acts, or omissions" can reasonably be construed as evidencing an intent to limit the scope of the exclusion to personnel actions, practices and policies based upon the list of specific personnel actions that both precede and follow the phrase.  And, the use of the more general language of "acts," "omissions," "coercion," "harassment," "humiliation," and "discrimination" can reasonably be viewed as merely an attempt  to ensure that the more specifically listed personnel acts would be covered even when they may also be tortious, *i.e.*, coercive, harassing, humiliating, defaming, or discriminatory.  <u>Peterborough Oil Company, Inc.</u>, 397 F. Supp. 2d at 238-239.  Also, another plausible reading of the language (perhaps more

30

expansive, but yet narrower than that of <u>Capitol Indemnity</u>) is that the exclusion covers the specifically listed personnel actions, practices, and policies and that the terms "harassment," "humiliation," and "discrimination" were added to also exclude acts giving rise to well-recognized, employment-law claims, such as claims for sexual harassment or discrimination on account of race, age, or sex. <u>See</u> <u>National Football League v. Vigilant Ins. Co.</u>, 824 N.Y.S.2d 72, 75-77 (Sup. Ct. App. Div. 2006); <u>North American Building Maintenance, Inc. v. Fireman's Fund Ins. Co.</u>, 137 Cal. App. 4th 627, 642-643 (Cal. Ct. App. 5th Dist. 2006); <u>see</u> generally D. Leitner, R. Simpson & J. Bjorkman, 5 <u>Law and Practice of Insurance Coverage Litigation</u> § 56:9 (2006); J. Monteleone & E. Grotell, <u>Symposium: Coverage For Employment Practices Liability Under Various Policies: Commercial General Liability, Homeowners', Umbrella, Workers' Compensation, and Directors' and Officers' Liability Policies</u>, 21 W. New Eng. L. Rev. 249, 265-268 (1999) (21 W. New Eng. L. Rev. 249).[11]

• The fact that more direct and simpler language could have been used had the broader interpretation now suggested by Acuity been intended. For example, in contrast to

---

[11]   The authors of  21 W. New Eng. L. Rev. 249 at 265 state that the ERP exclusion was developed by the insurance industry (through the auspices of the Insurance Services Offices (ISO)) in response to the rise of employment practice claims in the 1980's. The authors noted specifically that the drafters listed defamation as one of the listed employment practices, but not false imprisonment, and cited <u>Zurich</u> for the fact this omission creates an issue as to whether false imprisonment is an employment practice covered by the exclusion. <u>Id.</u> at 266-267.  The authors also note that some insurers, after adding the exclusion to commercial general liability (CGL) policies, started writing speciality coverage for employment-practice liability (EPL coverage). <u>Id.</u> at 249.  While not critical to the court's determination in this case, a review of two different editions of ISO policy language for EPL coverage available on LEXIS/NEXIS (<i>i.e.</i>, EP 00 01 04 98 & EP 00 01 01 02) indicates it is unclear whether the acts of false imprisonment in this case would be considered an employment-related practice for purposes of EPL coverage. <u>See also</u> <u>North American Building Maintenance, Inc.</u>, 137 Cal. App. 4th at 638-643 (setting forth EPL policy language and discussing the relationship between the ERP exclusion and EPL coverage).

the language of the ERP exclusion, the following exclusion for "Employer's Liability" applying to bodily injury in paragraph (1)(e) of the Exclusion portion of the policy is obviously more direct and broader in scope at it applies to employees:

e.   Employers' Liability
     *Bodily injury* to:
     (1)   An employee of the insured arising out of and in the course of:
           (a)   Employment by the insured; or
           (b)   Performing duties related to the conduct of the insured's business.
     * * * *

- The fact the policy explicitly provides coverage for "personal injuries" for the "offenses" of false imprisonment, malicious prosecution, defamation, and wrongful eviction, but the exclusion, while referencing defamation, does not make reference to either false imprisonment or malicious prosecution, even though employees may obviously be the victim of this type of conduct, as well as third-parties.  E.g., Peterborough Oil Company, Inc., 397 F. Supp. 2d at 242-243; Zurich, 996 F. Supp. at 988.

- The case law on both sides of the issue of whether the exclusion should be read broadly to cover all acts directed to employees arising during the course of employment or whether it should be interpreted more narrowly.  While the fact there are cases going both ways is by no means dispositive, the cases favoring the narrower interpretation are equally well-reasoned and supported by well-accepted principles of contract construction.[12]  In other words, this is not a situation where the

---

[12]  The court in Peterborough Oil concluded that commonsense dictated looking to the language surrounding the term "employment-related practice" to determine its meaning.  See also Moroni Feed Co. v. Mutual Service Cas. Ins. Co., 287 F.3d 1290, (10th Cir. 2002) (considering an ERP exclusion and stating that ,"[w]hen coverage or exclusions are described by a list of examples rather than specifically defined, the court must determine whether an item not listed as an example falls within the general description of the coverage or exclusion.").

In a New York case involving a somewhat different version of an ERP exclusion, the court held that two well-

language of the exclusion must be strained or "rewritten" to conclude it does not

apply and that there should be coverage.  Cf. Fisher, 1998 ND 109, ¶ 10.

Having determined that North Dakota courts would find the language of the exclusion to be

ambiguous as applied to the facts of this case, the Fisher decision, among other North Dakota cases,

compels the court to construe the exclusion against Acuity and find that it does not bar coverage for

NCV.[13]

## V.    ATTORNEY'S FEES

Under state law, insureds who prevail in coverage actions initiated by their insurers are

entitled to an award of attorney's fees.  Western Nat. Mut. Ins. Co. v. University of North Dakota,

2002 ND 63, ¶¶ 48-52, 643 N.W.2d 4; State Farm Fire & Cas. Co. v. Sigman, 508 N.W. 2d 323,

325-327 (N.D. 1993).  The North Dakota Supreme Court gives the following reason for this

deviation from the "American Rule:"

---

recognized principles of statutory and contract construction, *ejusdem generis* and *nositur a sociis*, required consideration of the surrounding language to determine what was intended by the reference to employment-related practice.  E.g., National Football League v. Vigilant Ins. Co., 824 N.Y.S.2d 72, 75-77 (Sup. Ct. App. Div. 2006).  The North Dakota Supreme Court has explained the principle of "*ejusdem generis*" as follows:

> Under the principle of ejusdem generis, general words which follow particular and specific words are not given their natural and ordinary sense, standing alone, but are confined to persons and things of the same kind, class, nature, or genus as the particular words.

Link v. Federated Mut. Ins. Co., 386 N.W.2d 897, 900 n.1 (1986); see generally J. Perillo & M. Kniffin, 5 Corbin on Contracts § 24.28(1998) (Corbin on Contracts).  The principle of *nositur a sociis*, is that the meaning of a contract word or phrase can be gleaned by the words or phrases immediately associated with it.  E.g., Jarecki v. G. D. Searle & Co., 367 U.S. 303, 307 (1961);  Corbin on Contracts at § 24.28 (1998).  In Jarecki v. G. D. Searle & Co., the Supreme court observed that the principle of *nositur a sociis* is often applied  to avoid giving language susceptible to multiple meanings unintended breadth.  367 U.S. at 307.

[13]  Acuity, NCV, and Thomas have all moved for summary judgment and filed extensive briefs along with statements of uncontested facts. No party has identified any material facts in dispute with regard to the ambiguity in the language of the ERP exclusion.  Further, the court gave the parties an additional opportunity to proffer relevant extrinsic evidence and none was proffered.  Consequently, summary judgment is appropriate.

> Litigation between an insurance company and its insured to determine coverage presents a unique situation. The insured pays premiums to receive protection, not a lawsuit from its insurer. When the insured gets that policy protection only by court order after litigating coverage, it is both 'necessary' and 'proper' to award attorney fees and costs to give the insured the full benefit of his insurance contract.... If an insured is not awarded attorney fees as supplemental relief, he is effectively denied the benefit he bargained for in the insurance policy."

Sigman, 508 N.W. 2d at 326-27.  When actual attorney fees can be recovered as a matter of state substantive law, they may be awarded in diversity cases.  Mathis v. Exxon Corp., 302 F.3d 448, 461-462 (5th Cir. 2002) (state law providing for award of attorney fees is substantive and governs in diversity cases);  McMahan v. Toto, 256 F.3d 1120, 1132 (11th Cir.2001) (same);  Cotton v. Sloane, 4 F.3d 176, 18-181 (2nd Cir. 1993) (same); see Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 259 n.31; see generally Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d §§ 2669 & 2675.

In this case, NCV is entitled to an award of its reasonable attorney's fees for the reasons given by the North Dakota Supreme Court for not following the American Rule in this instance and giving it the full benefit of its insurance contract.  Requests by the other parties, including Thomas, for attorney's fees will be denied because the other parties have prevailed on all issues.

## VI.    CONCLUSION AND ORDER

Based on the foregoing, it is hereby **ORDERED**, **DECLARED**, and **ADJUDGED** as follows:

1.    Acuity has no obligation to indemnify defendants Hilderman or Thomas for any liability of defendants Simnioniw and Hilderman in the state-court action: Civil #08-04-02232, District Court, Burleigh County, South Central Judicial District, State of North Dakota.

2.     Acuity has the obligation to provide NCV a defense for the claims asserted by Thomas in Civil #08-04-02232, District Court, Burleigh County, South Central Judicial District, State of North Dakota.  In addition, Acuity has the obligation to indemnify NCV for any liability arising out of the claims of negligent hiring and training, as well as any vicarious liability for the claim of false imprisonment, subject to any dollar limitations upon coverage under Acuity's policy.

3.     Consistent with the foregoing declarations and the court's opinion, the pending motions are disposed of as follows:

   a.     Acuity's motion for declaratory judgment (Doc. #56) is **GRANTED IN PART** and **DENIED IN PART**.

   b.     Thomas's motion for summary judgment (Doc. #76) is **DENIED**.

   c.     NCV's motion for declaratory judgment (Doc. # 94) is **GRANTED**.

4.     NCV is awarded its reasonable attorney's fees and taxable costs to be taxed against Acuity pursuant to Local Rule 54.1(C).

5.     All other requests for fees and costs are denied.

6.     The clerk shall enter judgment in accordance with this order.

Dated this 7th day of May, 2007.

.                                           /s/ Charles S. Miller, Jr.
                                            Charles S. Miller, Jr.
                                            United States Magistrate Judge